UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

National Council of La Raza, et al.,

Plaintiffs,

-against-

Alberto GONZALES, et al.,

Defendants.

-------------------------------------------------x

<span style="text-align:right">MEMORANDUM AND ORDER<br>03 - CV - 6324</span>

GLASSER, United States Senior District Judge

## INTRODUCTION

Plaintiffs National Council of La Raza ("NCLR"), New York Immigration Coalition ("NYIC"), American-Arab Anti-Discrimination Committee ("ADC"), Latin American Workers Project ("LAWP") and UNITE (collectively "Plaintiffs") bring this action against Alberto Gonzales, the Attorney General of the United States; Michael Chertoff, Secretary of Homeland Security; Robert Mueller, Director of the Federal Bureau of Investigation; Julie Myers, Assistant Secretary of Homeland Security in charge of Bureau of Immigration and Customs Enforcement;[1] the United States Department of Justice ("DOJ") and Department of Homeland Security ("DHS"), the Federal Bureau of Investigation ("FBI"), and Bureau of Immigration and Customs Enforcement ("ICE") (collectively "Defendants"), seeking a declaratory judgment and

---

[1] The action originally named Attorney General John Ashcroft, Secretary of Homeland Security Tom Ridge and Assistant Secretary of Homeland Security Michael Garcia. Those parties have been replaced as defendants by their successors in office pursuant to Fed. R. Civ. P. 25(d).

1

injunction against Defendants' policy and practice of entering and disseminating civil immigration information to state and local enforcement officials through the National Crime Information Center ("NCIC") database. Plaintiffs allege that this policy and practice violates the Administrative Procedures Act, 5 U.S.C. § 702, and wrongfully causes or induces state and local police to make immigration arrests that Congress has forbidden.

Before the Court is Defendants' motion to dismiss for lack of jurisdiction and failure to state a claim upon which relief may be granted.

## PARTIES

### I.    Plaintiffs

NCLR is a private non-profit organization and the largest constituency-based Hispanic organization in the United States. Its mission is to reduce poverty and discrimination and to improve opportunities for Hispanic Americans. In connection with this mission, NCLR advocates for its members on federal immigration policy issues. NCLR has nearly 300 member organizations in forty states, including New York. Some organizations that are members of NCLR have individual members who pay dues and exercise voting and representation rights within their own organizations. Many of the organizations that are members of NCLR provide legal, medical, or other services to non-citizens. NCLR has its principal place of business in Washington, D.C.

ADC is a non-profit civil rights organization committed to defending the rights of all people of Arab descent in the United States and promoting their cultural heritage. Founded in 1980 by U.S. Senator Jim Abourzek, ADC is the largest Arab-American organization of its kind and has members and chapters in cities throughout the United

States, including New York.  Its individual members pay dues and exercise voting and representational rights.  In connection with its mission, ADC advocates for its members on federal immigration policy issues.  Its principal place of business is in Washington, D.C.

NYIC is a non-profit umbrella policy and advocacy organization for roughly 150 New York member groups that work with immigrants and refugees.  Some of the organizations that are members of NYIC are themselves membership organizations, whose individual members pay dues and exercise voting and representational rights within their respective organizations.  NYIC's office and principal place of business is located in New York County, New York.

LAWP is a non-profit civil rights organization incorporated under the laws of New York.  Founded in 1997, the mission of LAWP is to secure better living and working conditions and respect for the labor and civil rights of immigrants.  The principal program areas of LAWP include organizing day laborers, street vendors, factory workers, and other employees, providing educational and cultural programs, and working to improve access to health care.  Members of LAWP pay dues and have voting and representational rights.  LAWP's principal place of business is in Kings County, New York.

UNITE is an unincorporated labor union of approximately 250,000 members in the United States and Canada.  Immigrant workers have been members of UNITE or its predecessor garment worker unions since their inception.  UNITE's mission includes working to address the immigration issues that affect its members.  In connection with this mission, UNITE advocates for its members on immigration policy issues.  Members

of UNITE pay dues and may run for leadership positions and vote in union elections. UNITE's principal place of business is in New York County, New York.

## II.    Defendants

Alberto Gonzales is the Attorney General of the United States, sued in his official capacity, who bears responsibility for oversight of federal law enforcement programs including the NCIC database, and shares responsibility for the implementation of federal immigration policy.  Michael Chertoff is Secretary of Homeland Security, sued in his official capacity, who shares responsibility for implementation of federal immigration policy and directs the Bureau of Immigration and Customs Enforcement ("ICE").  ICE is responsible for immigration enforcement functions formerly performed by the Department of Immigration and Naturalization Services ("INS").  Robert Mueller is the Director of the Federal Bureau of Investigation, sued in his official capacity. Pursuant to 28 U.S.C. § 534(c) and 28 C.F.R. § 0.85, the Attorney General designates the Director of the FBI to administer the NCIC database.  Julie Garcia is the Assistant Secretary of Homeland Security, sued in her official capacity, who oversees ICE and ICE law enforcement functions.

DOJ is the federal agency authorized by statute to administer the NCIC database. DHS is the federal agency responsible for securing the nation's borders, in part by enforcing federal immigration laws and managing the immigration process.  The FBI is the agency within DOJ responsible for administering the NCIC.  ICE is the agency within DHS responsible for investigating violations of the criminal and administrative provisions of the Immigration and Nationality Act ("INA") and for ensuring the departure of removable aliens from the United States.

# BACKGROUND

## I.    Factual Allegations

Plaintiffs allege that in 2003 Defendants began entering civil immigration records into the National Crime Information Center ("NCIC") Database.  The newly entered records identify as "absconders" persons with outstanding immigration warrants or  orders of deportation, exclusion or removal (collectively "immigration warrants"), and also identify individuals whom DHS believes have violated requirements of the National Security Entry-Exit Registration System ("NSEERS violators").[2]  Plaintiffs allege that there are significant error rates in these entries and that many of the identified individuals did not receive notice of either the entry of a removal order against them or their NSEERS obligations.

The NCIC database is queried millions of times each day by state and local law enforcement officials who interact with the public during lawful stops.  When a state or local police officer runs an NCIC check on an individual for whom an immigration warrant has been issued, an Immigration Violator File "hit" response advises the local law enforcement officer to contact the federal Law Enforcement Support Center, a division of DHS, for confirmation.  Upon confirmation, DHS typically requests the police officer to arrest or detain the alleged immigration violator until DHS officials can arrive to take custody of the person.[3]  Some local jurisdictions have resisted this request;

---

[2]  Plaintiffs allege as many as 19,000 absconders and "dozens" of NSEERS violators were entered into the NCIC database as of 2003 and that Defendants intend to expand the use of the NCIC database to include information regarding foreign students and previously deported persons with minor criminal convictions.

[3]  Plaintiffs allege that these arrestees typically do not face state or federal criminal prosecution; and police do not typically inform them of their Miranda rights.  Rather, the police detain them until

others have adopted a policy or practice of arresting absconders and/or alleged NSEERS violators listed in the NCIC.  Police in New York, Illinois, Minnesota, Connecticut, Florida have made arrests of immigrants in reliance on immigration warrants listed by Defendants in the NCIC. Moreover, the Immigration Violators File is a "hot file," meaning that private citizens and commercial enterprises can access its records or confirm the status of records under certain circumstances.

The thrust of Plaintiffs' Complaint is two-fold.  First, Plaintiffs allege that the policy and practice of entering removal orders into the NCIC exceeds Defendants' statutory authority pursuant to 28 U.S.C. § 534 and 8 U.S.C. § 1252c(b).  Second, Plaintiffs allege that because Congress has broadly preempted state and local law enforcement officials from enforcing immigration law, with some specific exceptions, Defendants are causing state and local officials to make unconstitutional arrests.

Plaintiffs allege that at least one member of each plaintiff organization, or of the associations that are members of each plaintiff organization (hereinafter, collectively, "plaintiff members"), has an outstanding immigration warrant or is not in compliance with an NSEERS requirement, and lives or works in a jurisdiction whose state or local police has a policy or practice of making immigration arrests in reliance on NCIC information.  (¶ 68).  Some of these plaintiff members regularly come into contact with state and local police, work in settings in which they are frequently questioned by police, or, based on their appearance as Arab, Muslim or South Asian, have been regularly questioned by police in the course of their daily lives.  (¶¶ 70-72).  These plaintiff

transfer to the custody of ICE for immigration enforcement procedures.  (¶ 55).  Some arrests have been made of United States citizens or individuals who have valid claims for immigration relief as the spouse or parent of a United States citizen, a political asylee, or otherwise.  (¶ 56).

members, who as a result of their immigration status may now be listed in the NCIC database, are allegedly at imminent risk of arrest by state or local law enforcement officials who stop or question them, and fear that if they contact state or local law enforcement officials to report a crime, or otherwise speak or communicate with government official, they may be arrested based on their presence in the NCIC database. (¶¶ 73-74). Moreover, their personal information placed in the NCIC "hot" files is available to neighbors, private citizens, or commercial enterprises. (¶ 75).

Plaintiffs also allege that the "misuse of the NCIC database to cause and induce expanded immigration enforcement by local police has created fear in immigrant communities." (¶ 65). "When any member of the community is afraid to communicate with law enforcement officials, police effectiveness is undermined and public safety is diminished for all." (¶ 61). Accordingly, Plaintiffs contend that the reduction in law enforcement effectiveness and diminishment of public safety constitutes injury suffered by the public at large.

## II.    Plaintiffs' Claims

### A.    Violation of 28 U.S.C. § 534 and the Administrative Procedures Act

Plaintiffs allege that Congress has specifically enumerated the categories of information that may be lawfully entered into and disseminated via the NCIC database. This authorization allegedly does not include the entry or dissemination of immigration warrants or orders for absconders or NSEERS violators. By entering civil immigration information into the NCIC database and disseminating that information to state and local official, Defendants have allegedly exceeded the statutory authority granted them

by Congress to establish and administer the NCIC database, pursuant to 28 U.S.C. § 534 and 8 U.S.C. § 1252c(b). These acts constitute final agency action within the meaning of the Administrative Procedures Act, 5 U.S.C. § 551.

**B.** **Violation of Article IV and Article VI of the United States Constitution**

Plaintiffs allege that the authority to regulate immigration and naturalization is an exclusively federal power that the Constitution requires be implemented uniformly nationwide. Congress's exercise of this power and its enactment of a comprehensive scheme for immigration enforcement has broadly preempted state and local police authority to enforce immigration laws, except where specifically authorized by statute. Thus, state and local police are allegedly preempted from arresting absconders or NSEERS violators on the basis of an administrative warrant or their presence in the NCIC.

Plaintiffs allege that by entering immigration information into the NCIC database, disseminating it to state and local police, confirming NCIC "hits" upon inquiry by local police, advising police to arrest absconders and NSEERS violators based on administrative warrants or information, and taking other actions, Defendants have caused or induced and are causing or inducing police to make immigration arrests that Congress has forbidden them from making. These practices create an imminent risk that plaintiff members will be wrongfully arrested by state or local police, in violation of the Fourth Amendment and the Supremacy Clause.

<u>**DISCUSSION**</u>

**I.** **Legal Standards to Establish Standing**

Article III, § 2 of the Constitution grants judicial power to the federal courts to adjudicate certain "cases" and "controversies."  In order to "identify those disputes which are appropriately resolved through the judicial process," the doctrine of standing remains "an essential and unchanging part of the case-or-controversy requirement." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992) (citing Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 1722, 109 L.Ed.2d 135 (1990)). To satisfy the "case or controversy" requirement, a plaintiff bears the burden of establishing three elements:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly . . . .trace[able] to the challenged actions of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision."

Lujan, 504 U.S. 560-61.

Because of the concern that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," Warth v. Seldin,  422 U.S. 490, 500, 95 S. Ct. 2197, 2205 (1975), organizations suing in a representative capacity face additional scrutiny.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.  528 U.S. 167, 181, 120 S. Ct. 693, 704 (2000) (citing

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L.Ed.2d 383 (1977)). These requirements address the core requirements of Article III "by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association" and "assur[ing] that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." United Food and Commercial Workers Union Local 751 v. Brown Group, Inc. 517 U.S. 544, 55-56, 116 S. Ct. 1529, 1530 (1996).

Finally, a plaintiff must demonstrate standing "for each claim and form of relief sought." Rosenberger v. New York State Office of Temporary and Disability Assistance, 153 Fed.Appx. 753, 755 (2d Cir.2005) (citing Baur v. Veneman, 352 F.3d 625, 642 n. 15 (2d Cir.2003)). Where, as here, plaintiffs seek injunctive relief, they must plead a "real and immediate threat of repeated injury." City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L.Ed.2d 675 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S. Ct. 669, 38 L.Ed. 2d 674 (1974)). "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement are unconstitutional." Shain v. Ellison, 356 F.3d 211, 217 (2d Cir.2004) (citing Lyons, 461 at 111, 103 S. Ct. 1660). And mindful of the "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," the "standing inquiry has been especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819-820, 117 S. Ct. 2312 (1997).

## II.    Analysis of Plaintiffs' Allegations of Injury-in-Fact

Defendants challenge the sufficiency of Plaintiffs' allegations of an injury-in-fact to plaintiff members.[4]  Plaintiffs in turn identify four injuries: first, the heightened risk to plaintiff members of arrest stemming from the placement of immigration data into the NCIC database; second, the fear of arrest resulting from Defendants' actions, manifest in a "chilling effect" that inhibits immigrants' First Amendment rights; third, the loss of privacy associated with the entry of immigration information into the NCIC database; and fourth, the overall deleterious effect on law enforcement when immigrants fear and fail to communicate with law enforcement officials.[5]  They contend that because a cessation of Defendants' practice and policy would mitigate these injuries, the causal relationship between Defendants' action and the alleged injuries is plain.

Plaintiffs assert that in addition to these injuries, the APA confers an "independent basis for standing" because "the injuries of which the plaintiff organizations complain fall within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for [the] Complaint," (Pl. Mem. at 12, (citing Lujan v. Defenders of Wildlife, 497 U.S. 871, 883, 110 S. Ct. 3177 (1990); United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S.

---

[4]  Defendants also object that Plaintiffs have failed to identify by name any particular plaintiff member injured.  However, such particularity is not required in pleadings.  It is axiomatic that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Defenders of Wildlife, 504 U.S. at 561.

[5]  This final assertion warrants no more than a footnote dismissal as a generalized grievance suffered "in some indefinite way in common with people generally."  Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 478 102 S. Ct. 752 (1982).

669, 686 (1973)).  This misapprehends the relationship of the statutory authorization of judicial review over agency action to the Article III standing requirement.  The APA "impose[s] a prudential standing requirement <u>in addition</u> to the [Article III] requirement . . . that a plaintiff have suffered a sufficient injury in fact.  For a plaintiff to have prudential standing under the APA, the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . .  in question."  <u>National Credit Union Admin. v. First Nat. Bank & Trust Co.</u>,  522 U.S. 479, 488, 118 S. Ct. 927, 933 (1998) (emphasis supplied, internal quotations and citations omitted).  The APA does not provide an independent basis for standing; it only authorizes, under certain conditions including the existence of an Article III injury-in-fact to the plaintiff, judicial review over final agency action.

### A.	Heightened risk of unlawful arrest

The first of Plaintiffs' alleged injuries is the heightened risk of unlawful arrest of plaintiff members whose immigration data has been entered into the NCIC.[6]  Assuming that such an arrest would constitute an injury, Plaintiffs still fail to plead, on this basis, an actual or imminent injury-in-fact to any plaintiff member.

As noted by the D.C. Circuit, "[s]ome injuries fit easily within or without the common definitions of 'actual' or 'imminent.' Others do not.  Among those which fit least well are purely probabilistic injuries." <u>Natural Resources Defense Council v. E.P.A.</u>, 440 F.3d 476, 483 (D.C. Cir.2006) (declining to find standing where NRDC members alleged a greater chance of contracting skin cancer, cataracts, and other ailments under

---

[6]  Such an assumption of "unlawful arrest" is bottomed upon the theory of Plaintiffs' second claim, that the arrest by state or local officials based on immigration warrants is unconstitutional under the doctrine of preemption.  The Court accepts this assumption only for the purpose of evaluating standing.

contested agency rule).  The Second Circuit has "not decide[d] as a matter of law whether enhanced risk generally qualifies as sufficient injury to confer standing," <u>Baur v. Veneman</u>, 352 F.3d 625, 634 (2d Cir.2003) (holding that "in the specific context of food and drug safety suits, exposure to potentially harmful products" is sufficient to confer standing), but the "potential expansiveness" of adopting such a doctrine was noted in <u>Baur</u> and has been criticized by other courts.  <u>Id.</u> at 636; <u>see also</u>, <u>e.g.</u>, <u>Center for Law and Educ. v. Department of Educ.</u>, 396 F.3d 1152, 1161 (D.C. Cir.2005) (finding no standing where "Appellants allege[d] direct injury styled as 'increased risk,' in the form of giving the States the opportunity to injure Appellants' interests.");  <u>Shain v. Veneman</u>, 376 F.3d 815, 818 (8th Cir.2004) (holding that increased risk of flood damage did not constitute imminent injury sufficient to confer standing where plaintiffs sued for an injunction to dismantle sewage treatment plant).  The specter haunting courts considering whether "risk of future injury" constitutes injury-in-fact is that "were all purely speculative 'increased risks' deemed injurious, the entire requirement of 'actual or imminent injury' would be rendered moot, because all hypothesized, non-imminent 'injuries' could be [exalted] as 'increased risk of future injury.'"  <u>Center for Law and Educ.</u>, 396 F.3d at 1161.[7]  The parties dispute the extent to which <u>Baur</u> recognizes "heightened risk" as an injury-in-fact.

<u>Baur</u> held that the heightened risk of contracting a food-borne illness from the consumption of downed livestock constituted a cognizable Article III injury-in-fact, even though the individual asserting the claim did not allege that he had actually been

---

[7]  In this vein, Plaintiffs' stylization of the heightened risk of arrest as "imminent risk of arrest" is redundant and perplexing.  (<u>Compl.</u> ¶ 73).  Risk is inherently both actual and imminent, thus the difficulty of evaluating it as an Article III injury.

exposed to any illness. Analogizing to other cases where individuals asserted claims based on increased risk of illness resulting from allegedly unlawful environmental conditions, see LaFleur v. Whitman, 300 F.3d 256, 270 (2d Cir.2002); N.Y. Pub. Interest Research Group (NYPIRG) v. Whitman, 321 F.3d 316, 325-26 (2d Cir.2002), the Baur court identified narrow circumstances in which "heightened risk" satisfies the injury requirement of standing. While one might read Baur as limited to its facts, see Baur at 634 ("In the specific context of food and drug safety suits, however, we conclude that such injuries are cognizable for standing purposes, where the plaintiff alleges exposure to potentially harmful products."), no principled distinction exists to other allegations of heightened risk of injury, such as those present here, without a consideration of the extensive rationale offered by Baur as to why and how a heightened risk of injury resulting from agency action becomes injury-in-fact.

For heightened risk to constitute an Article III injury-in-fact, Baur first requires that "there [be] a tight connection between the type of injury which [a plaintiff] alleges and the fundamental goals of the statutes which he sues under." Baur, 352 F.3d at 635. This "tight connection" standard transforms the qualitative analysis by which the court would typically determine the "concreteness" and "imminence" of an alleged injury into a relational analysis between the harm alleged and the statute at issue. Thus, in Baur, heightened risk could constitute an Article III injury where the food and drug statute at issue was "intended to ensure the safety of the nation's food supply and to minimize the risk to public health from potentially dangerous food and drug products," and the alleged violation of that statute increased plaintiff's risk of "exposure to dangerous food products." Id. at 634; cf. LaFleur, 300 F.3d at 270 (conferring standing on citizen to

14

challenge EPA's refusal to object under the Clean Air Act to sulfur dioxide emissions based on likely exposure); <u>NYPIRG</u>, 321 F.3d at 325 (conferring standing where plaintiff members alleged health effects of air pollution and uncertainty as to whether the EPA's actions expose them to excess air pollution).

Once the plaintiff has established the "tight connection" between the heightened risk of harm and the intended goals of the statute, <u>Baur</u> then requires the plaintiff to demonstrate a "credible threat of harm." The phrase "direct risk of harm which rises above mere conjecture," <u>Baur</u>, 352 F.3d at 636, suggests the reintroduction of an imminence standard; but a close analysis of <u>Baur</u> reveals that the plaintiff must demonstrate not imminence, but a non-trivial result from the "probability of harm" factored against the "severity of the probable harm." <u>Id.</u> at 637. In <u>Baur</u>, the court was moved to find a credible threat of harm because "downed cattle may transmit . . . a deadly disease with no known cure or treatment. Thus, even a moderate increase in the risk of disease may be sufficient to confer standing." <u>Id.</u>

Plaintiffs' assertion of a heightened risk of arrest as an injury-in-fact fails under both of the requirements identified in <u>Baur</u>. First, there is no "tight connection" between the risk of arrest to plaintiff members and 28 U.S.C. § 534 because the statute is not intended to protect plaintiffs against the risk of arrest in the same way that the Food and Drug Act is intended to protect citizens from unsafe products or the Clean Air Act is intended to protect citizens against unhealthy environmental conditions. To the contrary, the statute specifically authorizes the Attorney General to "exchange such records and information with, and <u>for the official use of</u>, authorized officials of the Federal Government . . . the States, cities, and penal and other institutions." 28 U.S.C. §

534(a)(4) (emphasis supplied).  Whether or not the immigration records are properly placed in the NCIC database, the statute clearly contemplates that those records will be accessible to law enforcement for official uses, one of which is making arrests.  Thus, the prospective injury (arrest) is not of the sort intended to be prevented by the statute.

The Plaintiffs likewise have failed to show a "credible threat of injury."  Not only are individual plaintiff members' actual risks of arrest in this case speculative, but the prospective injury provides its own remedy: plaintiff members detained for their immigration status will have due process opportunities to challenge the basis of their arrest, including the information in the NCIC database, and any other immigration determination that has been made against them.  While their risk of arrest may be greater than the plaintiff's risk of contracting a deadly disease in <u>Baur</u>, any undue harm is curable, compensable, or reversible, thus mitigating the credibility of the threat and requiring a significantly greater risk of injury in order to ameliorate the standing requirements.  It would be a bizarre result were the court to view the heightened risk of compelled legal process to resolve outstanding immigration warrants as of the same magnitude of harm to a person as the risk of contracting "a deadly disease with no known cure or treatment." <u>Baur</u> 352 F.3d at 637.

In the end, the "heightened risk" doctrine has only been applied in a narrow range of cases: those in which an agency's failure to conform to a statutory mandate has resulted in the plaintiff's exposure to a greater risk of an either difficult or impossible to remedy injury that the statute explicitly sought to prevent, and then, only in the context of exposure to environmental conditions or harmful products.   In this case, where there is no statutory mandate seeking to prevent the arrest of individuals who have

outstanding immigration warrants, nor is the "harm" to which plaintiff members are exposed clearly identifiable, the Court will not enable the expansion of the heightened risk doctrine. Plaintiffs have failed to establish standing to pursue their claims on the basis of heightened risk of arrest.

### B.      Fear of unlawful arrest

Plaintiffs next contend that Defendants' actions have caused plaintiff members to suffer injury in their reasonable fear of allegedly unlawful arrest by state or local officials. Plaintiffs submit that either the reasonable fear of arrest itself constitutes injury-in-fact or that the "chilling effect" upon their interactions with law enforcement officials resulting from that fear independently fulfills the injury-in-fact requirement.

The argument that plaintiff members' fear of unlawful arrest constitutes injury-in-fact was addressed by the Supreme Court in O'Shea v. Littleton, 414 U.S. 488, 94 S. Ct. 669 (1974). In that case, plaintiff residents of Cairo, Illinois, brought a civil rights class action seeking an injunction against the county magistrate and associate judge of the county circuit court for depriving plaintiffs and class members of rights under the Constitution and civil rights statutes. The officials allegedly engaged, under color of state law, in a continuing pattern and practice of conduct consisting of illegal bond setting, sentencing, and jury fee practices in criminal cases. Notably, none of the plaintiffs in O'Shea were actually facing charges or the discriminatory practices alleged at the time the Complaint was filed, but some had previously been arrested in the county, and all objected to the possibility that, if they were arrested in the future, they would be subject to the discriminatory practices. Observing that the plaintiffs' injuries were too speculative to establish standing, the Court characterized the situation thus:

> [T]he proposition is that if [plaintiffs] proceed to violate an unchallenged
> law and if they are charged, held to answer, and tried in any proceedings
> before petitioners, they will be subjected to the discriminatory practices
> that petitioners are alleged to have followed. But it seems to us that
> attempting to anticipate whether and when these [plaintiffs] will be
> charged with crime and will be made to appear before either petitioner
> takes us into the area of speculation and conjecture.

O'Shea, 414 U.S. at 497. Moreover, the Court noted that it assumed that plaintiffs would

"conduct their activities within the law and so avoid prosecution and . . . exposure to the

challenged course of conduct said to be followed by [defendants]," and refused to

"speculate whether respondents will be arrested, either again or for the first time . . .

particularly in the absence of any allegations that unconstitutional criminal statutes are

being employed to deter constitutionally protected conduct." Id.

The nature of the anticipated injuries alleged in O'Shea and in this case are

almost identical: Plaintiffs identify a government practice they believe is

unconstitutional and allege injury in that their own actions might result in such policy or

practice affecting them in the future. Moreover, as in O'Shea, Plaintiffs here do not

challenge the constitutionality of the underlying statutes; they do not challenge the

authority to issue immigration warrants, detain individuals for the purpose of resolving

outstanding warrants, or Congress's right to enact a statute that would authorize the

entrance of immigration warrants into the NCIC database. They only allege, with

respect to the actual arrests, that state and local authorities are engaged in an

unconstitutional practice and that their members may be affected by that policy in the

future. Such conjecture cannot satisfy the requirement of injury-in-fact to secure

standing.

That the Plaintiffs have additionally alleged a present fear of a prospective arrest

does not distinguish this case from O'Shea; a reasonable reading of O'Shea bears the inference that those plaintiffs feared future unlawful treatment as well. Indeed, stylizing a speculative injury as a present fear that the ultimate harm might occur does not change the conjecture of a future harm into an injury-in-fact. Conferring standing solely upon fear would enable the transformation of any prospective harm into an actual injury by a simple reference to an immediate corresponding emotion.

Such a limitation on standing was recognized in City of Los Angeles v. Lyons, 461 U.S. 95, 103 S. Ct. 1660 (1983), where the plaintiff alleged that he had been illegally placed in a chokehold by an officer, that the police had a regular practice of using illegal chokeholds, and that he feared that if he ever encountered another officer he would be placed in a chokehold again. The Court held that Lyons's subjective fear of a speculative future injury insufficiently established injury-in-fact on which to confer jurisdiction. In a footnote, the Court wrote:

> The reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

Lyons, 461 U.S. at 107, n.8 (emphasis in original). In the present case, Plaintiffs do not even assert previous arrests of plaintiff members subject to the alleged fear of arrest, but rely generally upon their knowledge of the existing practice of state and local authorities who make such arrests. In this sense, the injuries alleged by Plaintiffs are even more speculative and less particularized than the injury alleged in Lyons. But even assuming that plaintiff members might fear arrest on the basis of the prior arrest of other parties,

that "subjective apprehension" is insufficient to establish standing.  What is necessary is a  real and <u>immediate</u> threat to a plaintiff.  There is insufficient immediacy to the speculation that a plaintiff members' actions may result in some particular treatment at some indeterminate point in the future.

Plaintiffs nonetheless rely extensively upon the reasoning in <u>Roe v. City of New York</u>, 151 F.Supp.2d 495 (S.D.N.Y.2001), where the court held that intravenous drug users who participated in a state-authorized needle exchange program sufficiently alleged an injury-in-fact in that they feared arrest by the police, who had a pattern and practice of harassing, arresting and prosecuting registered participants found in the vicinity of state clinics.  In that case, the court acknowledged "that courts are loath to find that fear of an injury, without more, is not [sic][8] an injury in fact," <u>Id.</u> at 505 (<u>citing</u> <u>Martin v. Vaughn</u>, 1995 WL 458977, *1 (E.D.Pa.1995) ( "mental anguish" arising from fear of contracting HIV not an actual injury); <u>Robinson v. Vaughn</u>, 1992 WL 368461, *2 (E.D.Pa. 1992) (holding that "constant fear of contracting an asbestos-related disease" did not constitute actual injury); <u>Board of Commissioners v. Nuclear Assurance Corp.</u>, 588 F.Supp. 856, 859-60 (N.D.Ohio 1984) (fear of nuclear catastrophe on local roads was not actual injury)), but distinguished <u>Lyons</u> on three bases: first, that the NYPD had a practice of arresting Needle Exchange Program participants "for engaging in <u>lawful</u> behavior," <u>Id.</u> at 503 (emphasis in original); second, that the individual plaintiffs were "members of an identifiable class of targeted individuals," <u>Id.</u> at 504; and third, that the facts alleged constituted more than a chain of contingencies.  None of these distinctions

---

[8]   The addition of the word 'not' is clearly a typographical error in the context of three citations that found fear alone not to constitute an injury-in-fact.

applies with equal force in this case.

First, though they challenge whether state or local law enforcement officials may make such an arrest, Plaintiffs acknowledge that an immigration warrant lawfully authorizes the arrest or detention of a person for violation of immigration law. This is so whether or not the immigrant ultimately succeeds in offering a defense to the alleged violation. Thus, plaintiff members are not being arrested for participating in "lawful" activity in the same way that state-registered participants in a needle exchange program were in Roe.

Second, though plaintiff members allege that they are members of a class of affected individuals—namely those individuals who have been identified by ICE as immigration violators and whose information has been entered into the NCIC database—they do not allege that they are either identifiable or improperly targeted. The cases cited by Roe that have distinguished Lyons on this basis have reasoned that where plaintiffs allege a pattern of localized, intentional misconduct aimed at a particular set of identifiable individuals, those individuals satisfied the requirement that they show an imminent threat of injury. See, e.g., Thomas v. County of Los Angeles, 978 F.2d 504, 508 (9th Cir.1992) (distinguishing Lyons where "numerous instances of police misconduct have occurred in a small six by seven block area, some minority residents of the area have been mistreated by deputies more than once, and many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment."); Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police, 72 F.Supp.2d 560, 64-65 (D.Md.1999) (finding plaintiffs to have standing to enjoin racially discriminatory vehicle stops); National Congress for Puerto Rican

Rights v. City of New York, 75 F.Supp.2d 154, 162 (S.D.N.Y.1999) (standing to enjoin racially discriminatory stop and frisk policy).  By contrast, immigration violators are neither necessarily identifiable by law enforcement officials by appearance or location, nor are they allegedly targeted for enforcement on any inappropriate basis.  In the scenarios offered by the plaintiff as to when arrests occur, it is only after consulting the NCIC database that an alleged immigration violator can be identified and there is no suggestion that the police "target" these individuals in any way that differs from any other individual arrested on the basis of an outstanding warrant.

Finally, the court in Roe determined that, unlike Lyons, the NEP members had "reasonably demonstrate[d] a likelihood that [they] will be arrested."  In reaching this conclusion, the court considered the passage in Lyons in which the Court indicated that for Lyons to transform his speculative fear of future harm into actual injury, he would need to make the "incredible assertion either (1) that all police officers always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner."  Lyons, 461 U.S. at 107 (emphasis in original).  The police in Roe were allegedly targeting all NEP members in a delineated area, giving rise to the likelihood that the plaintiffs would be arrested.  In this case, however, where there is no allegation that the police intentionally identify or target individuals with immigration warrants, but only act upon the information once it is discovered in the course of regular activities, there is no analogous reasonable likelihood that any particular individual will actually be identified or arrested.  Any future encounter between a plaintiff member and the police is entirely speculative.  Whether the police

actually identify that plaintiff member's immigration status is speculative to a second degree. And the result of such an identification–that is, whether or not the officer actually makes the arrest or detention–is removed yet again. "Such an accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief." O'Shea, 414 U.S. at 497, 94 S. Ct. at 669

Plaintiffs also submit that the fear of arrest has had a chilling effect on plaintiff members, inhibiting their First Amendment rights to speak with local law enforcement officials on matters of public concern including unrelated criminal investigations and enforcement efforts. The seminal case on whether standing may be conferred by an alleged injury of a chill to protected speech, caused by a government policy or enactment, is Laird v. Tatum, 408 U.S. 1, 92 S. Ct. 2318 (1972). There, the Court addressed the question of whether a justiciable controversy existed where plaintiffs complained of a chilling effect on their exercise of First Amendment rights, when the effect was caused not by any specific action taken against them, but by the existence and operation of an intelligence gathering and distribution system conducted by the Army. In reaching its conclusion that plaintiffs had not established standing to challenge this practice, the Court noted that although "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights," this recognition "in no way erode[s] the established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action . . ." Laird v. Tatum, 408 U.S. 1, 11, 13, 92 S. Ct. 2318, 2324, 2325

(1972) (internal quotation omitted).  As one court later interpreted <u>Laird</u>, "a reluctance to engage in First Amendment protected activity prompted solely by a fear of future governmental malfeasance is not sufficient to confer standing." <u>Keene v. Meese</u>, 619 F. Supp. 1111, 1117  (D. Cal. 1985), <u>rev'd on other grounds</u>, 481 U.S. 465, 107  S. Ct. 1862 (1987).

Plaintiffs attempt to distinguish their case from <u>Laird</u> on the basis that "plaintiff members . . . allege that they also face a heightened risk of unlawful arrest due to defendants' NCIC policies."  (<u>Pl. Resp. Mem.</u> at 12 n.4).  As discussed <u>supra</u>, however, such a heightened risk is not cognizable in this case as an injury-in-fact.  Without satisfying the requirement that they plead an injury-in-fact, the contention that plaintiff members have experienced a subjective chilling of their speech is simply not relevant to the standing analysis.

Because Plaintiffs' assertion that fear of arrest constitutes an injury-in-fact is based on subjective speculation without any indicia of imminent or actual threat of injury, and because the chilling effect alleged by plaintiffs is irrelevant to the standing inquiry, fear of arrest may not constitute a basis on which to confer standing.

## C.     Loss of privacy

Finally, Plaintiffs contend that the NCIC harms plaintiff members' privacy interests because "[p]rivate citizens and commerical enterprises can access [the Immigration Violators File of the NCIC] or confirm the status of records under certain circumstances."  (<u>Compl.</u> ¶ 44).[9]  Plaintiffs have neither identified any source of a

---

[9]  Plaintiffs suggest that such a privacy right is created by the circumscribed authorization to enter and exchange records of 28 U.S.C. § 534 (granting the Attorney General the authority to "acquire collect, classify, and preserve identification, crime, and other records" and to "exchange such records and

privacy interest in their status as alleged immigration violators, nor cited any authority for the proposition that, assuming they have such a right, the potential access of that data by citizens or commercial enterprises violates it.  To put a finer point on the deficiency of their allegations, Plaintiffs do not allege that any unauthorized party has <u>actually</u> accessed the records of any plaintiff member listed in the NCIC database.  Rather, they generally contend that "Defendants' practices . . . compromise the privacy interests of immigrants,"  (<u>Compl.</u> ¶ 67), that "[p]ersonal information regarding plaintiff members has been or imminently will be placed in an NCIC 'hot' file," (<u>Compl.</u> ¶ 75), and that "[t]his information is available to neighbors, private citizens, or commercial enterprises." (<u>Compl.</u> ¶ 75).

Assuming that a right to maintain the confidentiality of their status as suspected immigration violators exists, Plaintiffs have nonetheless failed to plead any injury-in-fact to plaintiff members based on a violation of that privacy.  Though they have alleged that some plaintiff member information either has or will be entered into the NCIC database, they have not alleged a single instance in which the Defendants have exchanged that information with any unauthorized official or entity.  The speculation that at some point in the future some unauthorized party may access plaintiffs' file in violation of a plaintiff members' privacy right does not satisfy the requirement that plaintiffs identify an "actual or imminent," "concrete and particularized" injury.[10]

---

information with, and for the official use of, authorized officials of the Federal Government . . .") and the Department of Justice regulations enacted, in part, to "protect individual privacy."  28 C.F.R. § 20.1.  The Court takes no position on this untested theory.

[10]    During the pendency of the instant motion, Judge Baer of the Southern District of New York issued an opinion in a case presenting legal issues quite similar to this one, in which he concluded in <u>dicta</u> that the defendants lack statutory authority under 28 U.S.C. § 534 to enter civil immigration information into the NCIS database.  <u>See</u> <u>Doe v. Immigration and Customs Enforcement</u>, No. M-54 (HB), 2006 WL

### III.    Conclusion

Plaintiffs in this case are a set of advocacy organizations ostensibly suing on behalf of their members.  In actuality, they seek what would amount to an advisory opinion on the legality of certain law enforcement practices, in the absence of any actual case or controversy between any of their members and the government.  Because Plaintiffs have failed to plead any actual injury to any of their members, they have failed to establish that any of their members have standing to pursue these claims.  This failure precludes the organizations from suing in a representative capacity.  The motion to dismiss for lack of subject matter jurisdiction is granted.  The Clerk of the Court is respectfully directed to close the case.

SO ORDERED.

Dated:        Brooklyn, New York
              January 5, 2007

_____/s/_____

I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

---

1294440 (S.D.N.Y. May 10, 2006) (slip copy).  In <u>Doe</u>, the district court granted the government's motion for reconsideration pursuant to Fed. R. Civ. P. 59(e) and Local Civil Rule 6.3 and reversed its earlier order directing ICE to "correct the procedure by which non-criminal immigration information is entered into a criminal database and thus follows the subject, frequently to his detriment, forevermore," on the ground that the plaintiff, suing as an individual who had been denied employment due to incorrect information about his immigration history having been erroneously entered into the NCIS database, lacked standing to seek the prospective relief ordered by the court.  <u>Id.</u> at *1.  Before addressing the standing issue, however, Judge Baer reiterated that "[t]he information provided by the Government in this motion to reconsider fails to convince me that any statutory authority exists for the inclusion of this non-criminal information" in the NCIS database.  <u>Id.</u>  Taking no position on the validity of the <u>Doe</u> court's analysis of the defendants' statutory authority to include such information in the database, this Court nevertheless concludes that the motion to dismiss must be granted because, like the plaintiff in <u>Doe</u>, the Plaintiffs here lack standing to seek the requested relief.

**Counsel for the Plaintiff**

**Carmine Daniel Boccuzzi**
**Cleary, Gottlieb, Steen & Hamilton**
**One Liberty Plaza**
**New York, NY 10006**

**Michael J. Wishnie**
**Jerome N. Frank Legal Services Organization, Inc**
**Yale Law School**
**127 Wall Street**
**New Haven, CT 06511**

**Counsel for the Defendant**

F. Franklin Amanat
United States Attorney's Office
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201